# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| **SARAH TREMAGLIO and DEAN TREMAGLIO,** | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** | **Civil Action No. 3:23-cv-45** |
| **v.** | |
| **PHH CORPORATION,** | **JANUARY 11, 2023** |
| **Defendant.** | |

## COMPLAINT

Plaintiffs Sarah and Dean Tremaglio, by and through counsel, hereby bring this action against PHH Mortgage Services Inc., (together with all its predecessors in interest, including Ocwen Loan Servicing LLC, "PHH"), and state as follows:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and an amount in controversy greater than $75,000.

2.  Jurisdiction is additionally conferred on this Court pursuant to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2614. In accordance with 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction to hear all state law statutory and common law claims arising under this case or controversy.

3.  Venue lies in this District pursuant to 28 U.S.C. § 1391(b) given that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

4.  Plaintiffs Sarah and Dean Tremaglio are natural persons who own and reside at a home at 5 Sunny Dale Lane, Wallingford, CT, 06492. They have maintained this home as their primary residence for over twenty years.

5.  Plaintiffs are "persons" within the meaning of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA") in that they are "natural persons" under Conn. Gen. Stat. § 42-110a(3).

6.  Defendant PHH is a financial services corporation headquartered in New Jersey that engages in the business of servicing residential mortgage loans nationwide, including in Connecticut. References to PHH in this complaint are inclusive of Ocwen Loan Servicing, LLC as its predecessor-in-interest to PHH. Ocwen Loan Servicing, LLC serviced the Tremaglios' mortgage until May 2019, at which point it transferred service to PHH.

## SUMMARY OF CLAIMS

7.  Sarah and Dean Tremaglio assert a private right of action and claim for relief against PHH under the Connecticut Unfair Trade Practices Act (CUTPA) pursuant to Conn. Gen. Stat. § 42-110 *et seq* based on its years of inefficiency, disorganization, incompetence, and impropriety in servicing their mortgage.

8.  Sarah and Dean Tremaglio assert a private right of action and claim for relief against PHH under the Federal Real Estate Settlement Procedures Act ("RESPA"), pursuant to 12 U.S.C. § 2605(f). Their claims include violations of the specific rules, policies, and requirements set forth in RESPA's implementing regulation, Regulation X.

## FACTUAL ALLEGATIONS

9.   Plaintiffs Sarah and Dean Tremaglio own and live in a home at 5 Sunnydale Lane in Wallingford, Connecticut. Their home was the subject of foreclosure and ejectment actions in the case denoted as *Deutsche Bank National Trust Co. v. Sarah Tremaglio*, docket no. NHH-CV12-6077518-S. The mortgage they gave on their home is owned by a securitized mortgage pool for which Deutsche Bank National Trust Co. serves as Trustee.

10. On January 31, 2018, PHH initiated foreclosure proceedings against the Tremaglios. The Tremaglios applied for and agreed to a three-month trial loan modification later that year.

11. In December 2018 and January 2019, the Tremaglios made their first two trial payments through an automated phone system.

12. In February 2019, Dean Tremaglio called to make the third payment in the same manner as he and Sarah Tremaglio did for the first two. PHH confirmed that third payment had been received. *See* Exhibit A.

13. On March 1, 2019, while still waiting for PHH to send them an agreement reflecting the terms of their finalized loan modification, Dean Tremaglio attempted to make another monthly payment for the same amount of the prior three trial payments. PHH then told him that, contrary to its prior assertion, it had not received their third payment in February. The Tremaglios offered to make both their third and March trial payments that same day, but PHH refused to allow them to do so and instead informed the Tremaglios that they would have to reapply for a new modification.

14. On March 4, 2019, the Tremaglios received a letter from PHH indicating that they were no longer eligible for the loan modification previously offered because they had failed to make

the required trial modification payments. The Tremaglios disputed the March 2019 letter but submitted new application paperwork nonetheless.

15. In April 2019, PHH claimed that the Tremaglios were ineligible for its so-called "Proprietary Modification Program" and, accordingly, on April 25, 2019, PHH informed the Tremaglios that their latest loan modification application had been denied. Over the subsequent weeks, the Tremaglios attempted to reach someone whom PHH had designated as their dedicated contact. PHH obstructed these efforts by routing them to ever-changing, uninformed PHH representatives who could not answer questions about their case.

16. On May 12, 2019, the Tremaglios appealed PHH's denial for the Proprietary Modification Program on the basis that the denial was based on an incorrect "debt-to-income" calculation. They explained that they pay homeowners insurance, and that these payments were not included in the initial calculation, creating an artificially low, and apparently too low, monthly debt load. On May 15, 2019, PHH denied the Tremaglios' appeal.

17. Over the course of the next two years, the Tremaglios attempted to resolve the issue by sending detailed financial documents to PHH in the hopes of getting a new loan modification.

18. In response, PHH engaged in a pattern of carelessness, disorganization, and incompetence that prevented the Tremaglios from obtaining a loan modification. Among other misconduct, PHH:

- Claimed that it had not received the Tremaglios' documents, despite the Tremaglios' proof to the contrary;

- Failed to review the Tremaglios' submitted documents before they expired and then required that plaintiffs send new documents; and

- Fabricated a claim that the Tremaglios were enrolled in a forbearance plan and demanded that they submit a new packet of financial information on account of that falsehood.

19. After two years of back and forth, on September 15, 2021, PHH indicated that it was ready to agree to a workable loan modification, pending approval from an "investor."

20. On September 22, 2021, the Tremaglios received a letter from PHH stating that they had never been eligible for a loan modification, having reached the maximum number of modifications with capitalization permitted by the owner of their loan based on a pre-2019 modification. But in attempting to exonerate itself from its dilatory behavior and malfeasance, PHH disregarded the fact that this assertion was plainly irreconcilable with the years of communications and applications between PHH and the Tremaglios about a loan modification.

21. Additionally, the Tremaglios' failed trial modification from 2019 was never consummated and therefore did not involve any capitalization. If the owner restriction existed in 2018, then they could not have received the trial modification. PHH's claim regarding this purported restriction in 2021 was, at a minimum, arbitrary and capricious, if not outright erroneous based on the provision PHH claimed was in effect.

22. On September 30, 2021, the Tremaglios appealed this latest denial with PHH. PHH then switched gears, informing the Tremaglios that the denial was "not due to a restriction, but due to an investor rule." The Tremaglios asked PHH to produce a copy of the so-called investor rule.

23. On October 25, 2021, PHH falsely claimed that the Investor Pooling and Service Agreement (PSA) prohibited more than one modification with capitalization throughout the life of the loan.

24. Following the Tremaglios' efforts to obtain a copy of this supposed rule and provision from the PSA, PHH produced the alleged provision on December 3, 2021 (below). Nowhere did the language refer to a limit of one modification with capitalization:

> Servicer may waive, modify or vary any term of any Mortgage Loan to consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Obligor if in the Servicers reasonable determination in accordance with Accepted Servicing Practices such action is not materially adverse to the Owner; provided, however, that the Servicer shall not (a) make any future advances and (b) unless the Obligor is in default with respect to any Mortgage Loan or such default is, in the judgment of the Servicer imminent, permit any modification with respect to the Loan that would change the mortgage interest rate, defer or forgive the payment thereof of any principal or interest payments, reduce the outstanding principal balance (or any part thereof) except for actual payments of principal or extend the final maturity date. In such circumstance, the Servicer shall first obtain prior written consent of the Owner for any such modification.

25. On December 17, 2021, after almost four years of extreme stress and frustration, PHH reported that the investor "granted an exception," and the Tremaglios were finally approved for a trial modification.

26. Beginning from the time at which PHH botched the Tremaglios' trial modification in 2019, Dean and Sarah Tremaglio lived in a constant state of distress and anxiety.

27. Feeling insecure in their housing, they seldom slept or ate. Instead, they fought with one another and cried constantly. They believed that their situation was hopeless and that they would lose the home they had built together. As a result, they stopped making improvements to their house and did not plant the garden they had in years past. The Tremaglios felt defeated and saw no purpose in continuing to invest in their home.

28. The Tremaglios suffered a series of humiliations as a result of PHH's decision to pursue foreclosure after its own error. Though Sarah could not be faulted for the failure of the trial modification, her parents nonetheless lost faith in her as a capable adult. Much to Sarah's shame, her mother insisted that Sarah was unable to handle the responsibility of paying bills and

pressured the Tremaglios to allow her to have control over their finances. Soon after, Sarah's parents also removed her as the executor of their will. Both experiences deeply affected Sarah's sense of her self-worth.

29. Sarah's reputation also suffered in her workplace. Because Sarah was being considered for a new position, her employer conducted a background and credit check on her. The ongoing foreclosure negatively affected the resulting report and caused Sarah's employer to have a misimpression of her and her dependability. Sarah was put in a position in which she felt forced to disclose personal information about her family's ongoing problems with PHH in order to assuage her employer.

30. The Tremaglios also had to tolerate strangers visiting their home—without notice—to take pictures of the property. The Tremaglios felt violated by these visits and would not let their children outside on those days.

31. As a result of their interactions with Sarah's parents and workplace, the Tremaglios worried that their financial situation would generate disdain from the people in their lives or otherwise affect those relationships. They feared that their home would appear on online platforms with for-sale listings and that their friends or neighbors would discover this information.

32. This perpetual state of fear, stress, and uncertainty took its toll on the Tremaglios and their mental health. Sarah's anxiety worsened to such a state that her doctor prescribed her anxiety medication. As Sarah expressed in an email to PHH, "not a minute went by when this was not on [their] mind."

## CAUSES OF ACTION

Count I – *Violation of RESPA (Regulation X)*

33. The Tremaglios restate and incorporate all of their statements and allegations contained in paragraphs 1 through 32 in their entirety, as if fully rewritten herein.

34. In 2014, the United States Consumer Financial Protection Bureau issued 12 C.F.R. § 1024, known as Regulation X, to implement the Real Estate Settlement Procedures Act of 1974, as amended, 12 U.S.C. § 2601 *et seq*.

35. Regulation X requires that mortgage servicers "maintain policies and procedures that are reasonably designed to . . . [p]rovide accurate and timely disclosures to a borrower;" as well as "[p]rovide a borrower with accurate and timely information and documents in response to the borrower's requests for information with respect to the borrower's mortgage loan . . . ." 12 C.F.R. § 1024.38(b)(1)(i), (iii).

36. Regulation X also requires that mortgage servicers "maintain policies and procedures that are reasonably designed to . . . [i]nvestigate, respond to, and, as appropriate, make corrections in response to complaints asserted by a borrower . . . ." 12 C.F.R. § 1024.38(b)(1)(ii).

37. Time and time again, the conduct of PHH demonstrated that it either failed to adopt these statutorily mandated policies and procedures, or else failed to abide by them.

38. The first obvious failure occurred in 2018, at which point the Tremaglios were making trial payments related to an agreed-to modification. The Tremaglios made trial payments in December 2018 and January 2019. On February 1, 2019, the Tremaglios called PHH to make a third payment. Later that month, PHH confirmed that this third payment had been received. But when the Tremaglios called again to make the March 2019 payment, PHH reversed its position and claimed that it did not receive the February trial payment. As a result, PHH refused to carry out the loan modification and correct its error, despite the Tremaglios' efforts to both point out PHH's mistake and to remedy any supposed underpayment.

8

39. In sequence, PHH botched the payment, provided the Tremaglios false reassurance on which they relied, refused to take any responsibility for its transgression once discovered, deliberately failed to rectify its wrongdoing, and then brazenly used its own error to deny the Tremaglios the modification to which they were entitled. Its willful incompetence and impropriety in handling the Tremaglios' account forced them to restart the modification process.

40. Throughout subsequent evaluations for a new modification, PHH continued to exhibit behavior that was at odds with RESPA's obligations. In late 2020, PHH falsely claimed that it was missing the Tremaglios' financial documents. In response to this falsehood, the Tremaglios provided proof of PHH's receipt of said documents. Rather than make corrections to the record and review the Tremaglios' loan workout application, PHH again placed the burden on the Tremaglios to resubmit an entirely new application.

41. A similar occurrence took place in spring 2021, when PHH concocted a new reason to obstruct the Tremaglios' modification efforts. On this occasion, PHH professed that it could not review their modification request because the Tremaglios were on a COVID-19 forbearance plan. The Tremaglios had never agreed to a forbearance plan or been made aware that they were placed on one. The Tremaglios requested information about the forbearance and inquired why it would apply to them. After repeatedly ignoring these requests, PHH finally acknowledged that the Tremaglios were not, in fact, on forbearance. PHH had manufactured the forbearance premise and relied on that invention to absolve its inaction.

42. In September 2021, after the modification discussions dragged on due to PHH's delay in reviewing the Tremaglios' RMA packets, PHH finally responded by denying the Tremaglios' request for a modification. PHH represented that, due to an investor rule, there could only be one

modification with capitalization per life of the loan and, since the loan was previously modified in 2013, the Tremaglios were not eligible for another modification.

43. For several months, PHH failed to answer inquiries from the Tremaglios as to which modification counted towards the restriction and why the restriction could not be waived. PHH eventually produced a pooling and serving agreement that it claimed, falsely, contained the restriction. However, as reflected in contemporaneous reports, neither party could determine how the agreement related to the denial reason provided by PHH.

44. PHH is in violation of federal law due to its repeated failure to (1) provide the Tremaglios with accurate information about their loan; (2) provide accurate and timely disclosures; and (3) acknowledge receipt of requests for information within the statutory time period.

45. Pursuant to 12 U.S.C. § 2605(f), PHH is liable to the Tremaglios for actual damages, statutory damages of up to $2,000 for each violation discussed above, and costs and attorney's fees.

### Count II - *Unfair Acts and Practices Under CUTPA*

46. The plaintiffs Sarah and Dean Tremaglio restate and incorporate all of their statements and allegations contained in paragraphs 1 through 32 in their entirety, as well as paragraphs 37 through 43, as if fully rewritten herein.

47. PHH is a "person" within the meaning of Conn. Gen. Stat. § 42-110b(a), as defined in § 42-110a(3).

48. PHH's actions, and the actions of its agents, were done in the conduct of trade or commerce.

49. PHH has engaged in unfair acts or practices within the meaning of Conn. Gen. Stat. § 42-110b(a) including, but not limited to:

a. Bungling the Tremaglios' February 2019 trial modification payment, despite contemporaneous confirmation of payment receipt.

b. Pointedly refusing to complete the loan modification due to its own error—the "missing" trial payment—and unabashedly citing this mistake as reason to force the Tremaglios to restart modification negotiations.

c. Once in subsequent negotiations, continuing to manufacture delays by falsely claiming that financial documents submitted by the Tremaglios were somehow missing.

d. Failing to review in a timely manner the documents that the Tremaglios properly submitted and subsequently allowing those documents to expire.

e. Concocting a blatant falsehood about the Tremaglios' participation in a COVID-19 forbearance program and using this alleged participation as a reason to obstruct the Tremaglios from obtaining a loan workout.

f. Engaging in further dilatory and disorganized behavior by failing to produce even basic information about the forbearance program and later confessing that the Tremaglios had never been a forbearance plan.

g. Refusing to remedy these errors by reviewing the Tremaglios' previously submitted documents, and instead requiring the Tremaglios to assemble and submit new documents.

h. Erroneously denying the Tremaglios' request for a modification based on its own misrepresentation that an investor rule prevented Mr. and Mrs. Tremaglio from receiving a modification.

50. PHH's conduct has offended public policy, most obviously the Regulation X servicing rules discussed in Count I, *see* 12 C.F.R. § 1024.40.

51. PHH's actions were oppressive. PHH forced the Tremaglios to submit a series of new modification applications and financial documents over a period of several years by consistently claiming that it had not received documents, waiting until the last minute to inform the Tremaglios of required documents, failing to review documents in a timely fashion, or providing the Tremaglios false information about what was required of them. This domineering behavior would be burdensome and severe in any consumer relationship, but it was particularly so given the context. The Tremaglios were desperate to keep the home that they have owned for twenty years and in which they raise their children. The Tremaglios had no recourse other than to comply with PHH's requests for new packets.

52. PHH's actions were immoral, unethical, and unscrupulous. The Tremaglios acted in reliance on PHH's assertion that it had received the February 2019 trial modification payment. After it was discovered that PHH had erred in its receipt of a tendered payment, PHH refused to provide redress for its incompetence. Though the Tremaglios were willing to resubmit the payment, PHH refused to allow the Tremaglios to continue to make trial payments. By rejecting the payment, PHH doubled down on its wrongdoing. Appallingly, PHH then used its own misdoing as a basis to terminate the agreed-to modification. In effect, PHH steered the Tremaglios into an unwarranted servicer-manufactured foreclosure. PHH's unscrupulous behavior continued over the subsequent years. It repeatedly provided the Tremaglios incorrect information and used these inaccuracies to delay a new modification agreement for several years. As a result, PHH was able to profit from its own dilatoriness and falsehoods.

53. PHH's actions expose a pattern of botched loan servicing, widespread errors, faulty systems management, and inaccurate borrower information.

54. PHH's impropriety and malfeasance caused substantial financial and emotional injury that the Tremaglios could not reasonably avoid given their willingness to make all trial payments and their subsequent compliance with all document and information requests.

55. Throughout a global pandemic, the Tremaglios have had an unnecessary foreclosure looming over them, which in turn, has cost them thousands of dollars in accrued interest and intense emotional distress.

56. This injury is not outweighed by any countervailing benefits to the Tremaglios or consumers like them.

57. As a result of the foregoing acts, the Tremaglios have suffered an ascertainable loss, as that term is used in Conn. Gen. Stat. § 42-110g(a), including, without limitation, the thousands of dollars in interest they have accrued on their loan for the many months they were not subject to a modification, as well as the costs and attorney's fees charged by PHH.

58. Because of PHH's willful disregard for the Tremaglios' well-being, the Tremaglios have suffered from severe emotional distress out of fear of losing their family home shared with their two young children. The repeated failure of PHH to deal fairly with the Tremaglios engendered confusion and mental distress. Sarah Tremaglio stated to PHH that "this matter is impacting our everyday mental state."

59. As a result of its violation of CUTPA, PHH is liable to the Tremaglios for actual and consequential damages, costs, and attorney's fees pursuant to Conn. Gen. Stat. § 42-110g(d).

Count III - *Recklessly Unfair Acts or Practices Under CUTPA*

60. The plaintiffs Sarah and Dean Tremaglio restate and incorporate all of their statements and allegations contained in paragraphs 1 through 32 in their entirety, as if fully rewritten herein.

61. PHH's conduct as alleged above continued over the span of more than three years and persisted in spite of the Tremaglios' unwavering efforts to ensure that PHH recognized their compliance with all of its modification requirements.

62. This unfair conduct was without reasonable justification or excuse, and persisted after the defendant and its agents were notified of its errors. In refusing to remedy the situation, PHH demonstrated a reckless, and at times, willful indifference to the Tremaglios' rights and to the harm done to their well-being, and the well-being of their children, due to the excessive time, money, energy spent by the Tremaglios in their attempts to work with PHH to reach an agreement.

63. Through the arbitrary and opaque delays, and PHH's failure to accurately convey necessary information necessary to come to a modification agreement, the Tremaglios have paid costs and attorney's fees charged by PHH, as well as additional interest—accrued at a higher rate than it would have been had the modification process been properly and fairly handled—due to the long-delayed foreclosure process.

64. Accordingly, Sarah and Dean Tremaglio are entitled to actual and punitive damages under Conn. Gen. Stat. § 42-110g(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sarah and Dean Tremaglio respectfully requests that this Court enter an order granting judgment against Defendant PHH for the following:

1. Actual damages against Defendant as to allegations contained in Counts I, II, and III;

2. Statutory damages of $2,000 for each and every violation contained in Count I;

3. Punitive damages, pursuant to Conn. Gen. Stat. § 42-110g(a), as to all allegations contained

   in Count III; and

4. Reasonable attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g(d) and 12

   U.S.C. § 2605(f)(3).


|  |  |  |
|---|---|---|
|  | | Respectfully Submitted, |
| DATED: January 11, 2023 | | THE PLAINTIFFS |
| | | Sarah and Dean Tremaglio |
| | By: | /s/ *Jeffrey Gentes*_____ |
| Callie Bruzzone | | Jeffrey Gentes (ct28561) |
| Yale Law School '23 | | Anika Singh Lemar (ct31345) |
| Law Student Intern | | Jerome N. Frank Legal Services Org. |
| | | Yale Law School |
| Clare Elizondo | | P.O. Box 209090 |
| Yale Law School '23 | | New Haven, CT 06520-9090 |
| Law Student Intern | | Tel.: (203) 432-4800 |
| | | Fax: (203) 432-1426 |
| Leah Kazar | | jeffrey.gentes@ylsclinics.org |
| Yale Law School '23 | | anika.lemar@ylsclinics.org |
| Law Student Intern | | lso.juris@ylsclinics.org |
| | | |
| Miriam Pierson | | |
| Yale Law School '23 | | |
| Law Student Intern | | |